LLOYD S. ROHLIG AND KATHLEEN M. ROHLIG, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Rohlig v. Commissioner
Docket No. 1014-88
United States Tax Court
T.C. Memo 1991-267; 1991 Tax Ct. Memo LEXIS 305; 61 T.C.M. (CCH) 2889; T.C.M. (RIA) 91267; June 11, 1991, Filed *305 Decision will be entered under Rule 155. Douglas R. Thompson and Lisa Gill Rowling, for the petitioners. Roslyn D. Grand, for the respondent. GERBER, Judge. GERBER
MEMORANDUM OPINION [1]
Respondent, in a statutory notice of deficiency, determined deficiencies in and additions to petitioners' Federal income tax for the 1983 and 1984 taxable years as follows: Additions to Tax
Year
Deficiency
Sec. 6653(b)(1) [2]
Sec. 6653(b)(2)
1983
$ 1,306,353
$ 653,177
Applies to deficiency
1984
155,512
77,756
Applies to deficiency
The issues presented for our consideration are: (1) Whether petitioners understated their income for 1983 and 1984 in accord with respondent's reconstruction determination *306 by means of the bank deposits method; (2) whether various specific deposits to various financial accounts represent unreported income of petitioners for their 1983 and 1984 taxable years; (3) whether petitioners are entitled to various deductions and depreciation; and (4) whether petitioners are liable for the additions to tax for fraud under section 6653(b)(1) and (2) for their 1983 and 1984 taxable years. The parties entered into a stipulation of facts, along with attached exhibits, which are incorporated herein by this reference. Petitioners, who at all pertinent times were husband and wife, had their legal residence in Marietta, Georgia, at the time the petition was filed in this case. Petitioner Lloyd S. Rohlig (hereinafter the use of petitioner in the singular refers to Lloyd S. Rohlig) is a college graduate with a degree in accounting. His accounting studies included the study of the tax area. During the years 1983 and 1984 *307 petitioner was a self-employed accountant and he was also involved in real estate management. During those same years Kathleen Rohlig was a student at Life Chiropractic College and was also involved in real estate management. For each of the taxable years 1978, 1980, 1982, 1983, and 1984, petitioner prepared the joint Federal income tax returns filed by petitioners. For the taxable years 1977 and 1979 petitioners did not file Federal income tax returns. Prior to the 1983 taxable year, petitioner had been employed by the State of Michigan and had earnings ranging from about $ 12,000 to over $ 19,000. At various times no returns were filed, and on one occasion during 1977 petitioner made the claim to his employer that petitioner was entitled to 99 exemptions and that he was exempt from the withholding of Federal tax. Robin Gayle Rohlig (Robin) is petitioner's sister and petitioner prepared her 1982 through 1985 Federal income tax returns. With respect to Robin's 1982 return, petitioners' son (Shawn) was claimed as a dependent. Thereafter, petitioners filed a Form 1040X amended Federal tax return claiming Shawn as their dependent in order to claim an earned income credit of $ *308 303, which was not available without a "qualifying dependent." During October 1986, Cathy Mason (Mason), who had been an Internal Revenue Agent for 9 years, was conducting an examination of petitioners' 1983 and 1984 tax liabilities and she wrote to petitioners scheduling an appointment and requesting various documents. Petitioners did not appear for the appointment or otherwise submit any documents. Mason had also conducted the examination of petitioners' 1982 tax liabilities. Petitioners had also been examined by an agent of respondent for their 1977 through 1980 taxable years and did not provide any records in accord with respondent's agent's request. Mason discovered that petitioners were connected with the Life Science Church and had been identified as potential tax protestors due to that affiliation. Due to the lack of cooperation Mason, on February 18, 19, and 20, 1987, issued third-party record-keeper summonses to 10 financial institutions, along with notices of each summons to petitioners. After the summonses were issued, petitioner and Mason met, but no documents or information supporting the figures reported on petitioners' returns were turned over. On March 12, *309 1987, petitioners sought to quash the summonses and on May 14, 1987, the United States District Court for the Northern District of Georgia denied petitioners' attempt to quash the summonses. Pursuant to section 7609(e)(1), the period for assessment with respect to petitioners' 1983 taxable year was extended by 63 days. Because the period for assessment would have otherwise expired on August 16, 1987, it was extended to October 17, 1987. The notices of deficiency for petitioners' 1983 and 1984 taxable years were mailed to petitioners on October 14, 1987. Petitioners' failure to provide records in support of the amounts reported on their 1983 and 1984 Federal income tax returns caused Mason to reconstruct petitioners' taxable income for each year by means of a simplified bank deposits method. Mason totaled all deposits from petitioners' various financial accounts and reduced the total by transfers between accounts, redeposited items, and nontaxable items of deposit to arrive at "net taxable deposits." To the extent that net taxable deposits exceeded the total income reported on petitioners' return, the excess was treated as unreported income. If Mason had used the usual bank deposits *310 method of reconstruction, she would have determined which of petitioners' expenses were business and which were personal. That might have resulted in additional income unreported by petitioners. Mason was not able to determine the character of the expenditures because petitioners did not provide records and Mason was not able to obtain all checks from the various financial institutions to which summonses were issued. Respondent's reconstruction resulted in the following computations which were set forth in the notices of deficiency to petitioners: 1983
1984
Total bank deposits
$ 7,201,252.40
$ 760,575.67
Less:
Nontaxable sources
4,544,870.27
402,312.08
Net taxable deposits
$ 2,656,382.13
358,263.59
Less:
Income reported
21,734.16
15,224.90
Unreported income determined
by respondent
$ 2,634,647.97
$ 343,038.69
Subsequent to the issuance of the notice of deficiency and prior to trial, petitioners submitted to respondent documentation concerning various matters, including information concerning additional bank accounts of which respondent was not aware. Based upon the additional information, respondent's reconstruction and recomputation of petitioners' *311 unreported income for 1983 and 1984 is as follows: 1983
1984
Income reported per return:
Interest
$ 15,084.16
$ 2,069.90
Schedule C gross receipts
1,475.00
4,675.00
Schedule E gross receipts
5,175.00
8,480.00
Total income reported
$ 21,734.16
$ 15,224.90
Revised taxable deposits
per respondent
89,882.33
145,596.00
Revised unreported income
per respondent
$ 68,148.17
$ 130,371.10
Petitioners do not agree that any part of the $ 89,882.33 or $ 145,596.10 of revised deposits computed by respondent is taxable for their respective 1983 or 1984 taxable years. During the 1983 and 1984 taxable years petitioners maintained, in their own names and those of nominees, about 20 different accounts in financial institutions including banks, savings and loans, and with stockbrokers. The remaining disputed deposits to various of these accounts are set forth below: Amount Disputed
Institution
Date of Deposit
Amt. of Deposit
By Petitioners
Peach State:
April 8, 1983
$      992.50
$ 992.50*   First Fed.:
April 14, 1983
5,000.00 5,000.00(1)
April 18, 1983
336.00
336.00*   May 20, 1983
6,603.80
6,603.80(2)
United Fed.:
Aug. 19, 1983
94,342.50
342.50*   FNB Cobb:
April 21, 1983
$      200.00
$ 200.00(1) May 24, 1983 122.00
122.00(3) June 17, 1983
82.00
82.00(3) July 18, 1983
280.00
280.00(1) Aug. 23, 1983
122.00
122.00(3) Sept. 19, 1983
82.00
82.00(3) Oct. 19, 1983
290.00
290.00*   Oct. 26, 1983
50.00
50.00(1) Nov. 15, 1983
2,171.05
1,883.65(11)
Nov. 16, 1983
2,280.00
2,280.00(5) Nov. 22, 1983
280.00
280.00(4) Nov. 30, 1983
300.00
300.00(4) Dec. 5, 1983
18,898.20
18,435.00(6) Dec. 13, 1983
342.00
342.00*   Dec. 19, 1983
4,873.74
773.74(6) Georgia Fed.:
Jan. 18, 1983
8,939.29
8,939.29(8) Feb. 2, 1983
400.00
400.00*   Feb. 15, 1983
70.00
70.00*   Feb. 17, 1983
333.03
333.03*   Feb. 22, 1983
717.29
717.29*   Feb. 22, 1983
4,150.00
4,150.00(13)
March 14, 1983
35.00
35.00*   March 21, 1983
100.00
100.00(1) April 8, 1983
537.00
537.00(7) April 11, 1983
1,000.00
1,000.00(1) April 14, 1983
300.00
3.00*   May 7, 1983
244.50
244.50(3) June 16, 1983
65.00
65.00*   July 27, 1983
500.00
500.00*   Aug. 4, 1983
300.00
200.00(1) Aug. 5, 1983
63.72
63.72(1) Aug. 8, 1983
256.00
256.00*   Aug. 10, 1983
60.00
60.00*   Aug. 22, 1983
130.00
130.00*   Sept. 23, 1983
100.00
100.00(1) Oct. 17, 1983
59.81
59.81(1) Oct. 24, 1983
20.00
20.00(1) Citibank:
April 19, 1983
3,500.00
3,500.00(12)
FNB Cobb:
Jan. 19, 1984
20,005.00
876.66(6) Feb. 1, 1984
200.00
200.00(1) Feb. 2, 1984
1,710.42
500.00*   Feb. 21, 1984
25,299.97
621.31(6) March 22, 1984
40,323.43
323.43(6) May 25, 1984
112,012.50
112,012.50(11)
July 5, 1984
7,000.00 1,230.83(6) Aug. 8, 1984
8,232.22
6,169.39(1) Aug. 21, 1984
112,936.67
536.45(6) Georgia Fed.:
Feb. 29, 1984
$      359.96
$ 359.96*   April 12, 1984
813.78
813.78(1) June 18, 1984
882.21
500.00(4) July 3, 1984
1,442.00
1,442.00(9) July 16, 1984
1,400.00
1,400.00(10)
July 20, 1984
1,500.00
1,500.00(9) July 26, 1984
48.53
48.53(1) Sept. 10, 1984
684.39
684.39*(1)
Sept. 28, 1984
503.00
500.00(4) Dec. 14, 1984
49.00
49.00*   *312 An asterisk (*) has been placed next to each disputed deposit where petitioner did not recall the source and/or no evidence was presented to explain the nature or source of the deposit. In addition to these deposits were numerous other deposits which the parties agree do not represent taxable income and which made up the nearly $ 8,000,000 in deposits to petitioners' accounts or to accounts of their nominees. A large portion of the deposits no longer in dispute represent amounts deposited in connection with a kiting scheme between banks wherein interest was sought on the float. With respect to the above-listed disputed deposits, evidence was offered at trial concerning only certain of them. The remaining deposits have been marked or numbered to correspond with the following findings of fact and legal conclusions. (1) Petitioner claimed that these amounts consisted of deposits of cash items resulting from cash withdrawals by means of checks, automated teller machine withdrawals, and other sources. Petitioner's testimony was generalized concerning most of these items. Additionally, the time lapse between cash withdrawals and deposits was usually too distant to reasonably be *313 considered credible. Petitioner also claimed that some of these amounts were from rebates (presumably from companies offering them to purchasers of products) without providing any specific proof other than his testimony. Petitioners are not entitled to any reduction of the bank deposit analysis with respect to these items. (2) $ 6,603.80 - This amount was received by petitioner's sister, Robin, in the form of a $ 7,503.80 check from an insurance company. It was given to petitioner to invest (presumably in his kiting scheme) and he deposited the check and took a $ 900 cash withdrawal resulting in a $ 6,603.80 net deposit. Accordingly, the 1983 bank deposit analysis should be reduced by $ 6,603.80. (3) These items petitioner testified were "dividends" to his sister, Robin, but he did not explain the nature or source of the dividend. No documentation concerning the "dividends" was offered and no reduction of the bank deposit analysis is allowed. (4) These items concern petitioner's statements that they represent deposits from tenants who rented realty from petitioner. Petitioner did not show the return of the deposit or distinguish the "deposits" from rents and no adjustment *314 is to be made to respondent's computation. (5) These are items that petitioner claimed were given to him by his sister. No corroboration was provided to show that amounts were from his sister and no adjustment is allowed to petitioners. (6) These items were shown to be income or proceeds from the sale of notes of petitioner's sister, Robin, in connection with her ownership of Chrysler Corporation securities which were reported on her 1983 Federal income tax return. Accordingly, respondent's 1983 and 1984 bank deposit analysis should be appropriately reduced by these amounts. (7) Petitioner claimed that this amount represented birthday gifts because it was deposited on the date of his birth. This testimony is novel, but not credible or corroborated and no reduction is allowable. (8) This item petitioner claimed was the proceeds of the sale of stock with only $ 707.90 as a capital gain. Petitioners' 1983 Federal income tax return does not reflect the sale of any stock, the receipt of any dividends, or the reporting of any capital gain income and no reduction is allowable. (9) Petitioner received insurance reimbursement of this amount in connection with damage to real property, *315 and the 1984 analysis should be reduced by $ 1,442. (10) This amount represents a transfer between accounts which petitioner redeposited and, accordingly, the 1984 analysis should be reduced by $ 1,400. (11) The $ 1,883.65 and $ 112,012.50 checks involve San Jacinto Title Company and the bankruptcy of Murray B. Millican (Millican). Petitioners moved from Detroit, Michigan, to Corpus Christi, Texas (the area where Kathleen Rohlig's parents lived), during January 1980. On April 1, 1980, Kathleen's parents purchased a parcel of subdivided vacant land for the fully financed price of $ 21,500. The financing was through the seller, Weber Land Company. Petitioner, along with Kathleen's father, during 1980 built a quadraplex on the purchased land. On December 9, 1981, Kathleen's parents sold the quadraplex to Millican for $ 165,000, receiving a $ 10,050 cash downpayment and two notes for the balance. The notes were in the amounts of $ 40,000 and $ 110,000. Millican, by March 26, 1982, had defaulted on the notes and subsequently filed for protection under the Bankruptcy Act. A part of a November 15, 1983, $ 2,171.05 deposit to petitioners' bank account in the name of their Life Science *316 Church was a $ 1,883.65 check from Tim Truman, chapter 13 trustee, reflecting an "in re" for Millican. On March 16, 1984, Millican sold the quadraplex for $ 172,000 to a person who in name appears to be a related party, and as part of the closing, San Jacinto Title Company was authorized to pay off the notes to Kathleen's parents in the amount of $ 134,050. On May 25, 1984, petitioners deposited a $ 112,012.50 check from San Jacinto Title Company in their FNB Cobb bank account. Petitioners claim that the $ 112,012.50 amount received in connection with the resale of the quadraplex represents the repayment of a loan made to Kathleen's parents. Petitioners provided no evidence that any amount of funds was advanced or loaned to Kathleen's parents or the source of same. Concerning the $ 1,883.65, petitioners claim that the amount is from a nontaxable source. No reduction to respondent's analysis is allowed for these items. (12) The source of this $ 3,500 deposit was a check signed by both Kathleen and Robin Rohlig. The check was deposited in petitioner's bank account but represents funds of Robin Rohlig which were managed and/or held by petitioner. Respondent's analysis should *317 be reduced by $ 3,500 for 1983. Petitioner maintained and managed his sister Robin's funds. For reasons unexplained in the record, Robin's assets and funds were intermingled in petitioner's bank accounts. Additionally, during the years in question, petitioners, on two or more occasions, purchased realty. On one occasion Robin's name was on the deed and on another it was not. Subsequent to purchase, petitioner deeded his portion to Kathleen and Robin. Also for reasons which were not adequately explained in the record, stock and other securities were held in Kathleen's and Robin's names, although petitioner was the person who was looking after his sister's funds and assets. (13) Petitioner stated that this amount was from the sale of his automobile but produced no corroborating evidence and no reduction is allowable. In this case respondent reconstructed petitioners' 1983 and 1984 income because they refused or failed to provide records to respondent's agent who was examining petitioners' 1983 and 1984 income tax returns. Subsequent to the issuance of the notice of deficiency and prior to trial, petitioners did provide some documentation and information concerning various deposits. *318 Based upon the information provided, respondent reconstructed petitioners' income. Petitioners question the use of a reconstruction method and respondent's use of the so-called simplified bank deposits method. In the absence of adequate records, respondent may use a method of reconstruction of a taxpayer's income which clearly reflects income. Holland v. United States, 348 U.S. 121, 99 L. Ed. 150, 75 S. Ct. 127 (1954); United States v. Johnson, 319 U.S. 503, 87 L. Ed. 1546, 63 S. Ct. 1233 (1943). We have found that petitioners failed to provide records to respondent's agent, records which were available and which were presented only after a notice of deficiency was issued to petitioners. Petitioners' complaint about the need for respondent to use a method of reconstruction is without substance. The need for respondent's use of a reconstruction method was brought forth by petitioners' actions or intentional omissions, as the case may be. Petitioners also complain about respondent's use of a "simplified bank deposits method." Respondent explained the difference between the bank deposits method and the simplified version. The difference is that the simplified version does not include personal and *319 cash expenditures of petitioners. Respondent correctly points out that use of the simplified method, of necessity, results in less potential for additional or unreported income. Accordingly, we do not find any fault, error, or abuse of discretion in respondent's use of the simplified bank deposits method. In Webb v. Commissioner, 394 F.2d 366, 373 (5th Cir. 1968), affg. a Memorandum Opinion of this Court, it was held that: Arithmetic precision was originally and exclusively in * * * [the taxpayer's] hands, and he had a statutory duty to provide it. He did not have to add or subtract; rather, he had simply to keep papers and data for others to mathematicize. Having defaulted in his duty, he cannot frustrate the Commissioner's reasonable attempts by compelling investigation and recomputation under every means of income determination. * * *
Here, because of the extraordinary size of petitioners' bank accounts, the relatively large number of accounts at financial institutions, and the general lack of other records or information, respondent's use of a form of the bank deposits method was proper. Respondent is not required to use a particular method. *320 Petitioners bear the burden of proving that respondent's determination is in error. Welch v. Helvering, 290 U.S. 111, 78 L. Ed. 212, 54 S. Ct. 8 (1933); Rule 142(a). Bank deposits are prima facie evidence of income, and petitioners bear the burden of proving that respondent's determination based on this evidence is in error. Tokarski v. Commissioner, 87 T.C. 74, 77 (1986); Estate of Mason v. Commissioner, 64 T.C. 651, 656-657 (1975), affd. 566 F.2d 2 (6th Cir. 1977). Initially, petitioners had refused to provide any records in support of the amounts reported on their income tax returns. Respondent reconstructed petitioners' income by means of the bank deposits method. Because petitioners had numerous bank accounts and substantial deposits, respondent's initial determination resulted in $ 7,201,252.40 and $ 760,575.67 of income for 1983 and 1984, respectively. After reducing those amounts by nontaxable sources, respondent arrived at net taxable deposits of $ 2,656,382.13 and $ 358,263.59 for 1983 and 1984, respectively. After accounting for the income reported by petitioners, respondent determined unreported income of $ 2,634,647.97 *321 and $ 343,038.69 for petitioners' 1983 and 1984 taxable years, respectively. After petitioners commenced this case, they provided certain records and information that permitted respondent to reduce his determination of unreported income to $ 68,148 and $ 130,371 for petitioners' 1983 and 1984 taxable years, respectively. A large portion of the deposits were eliminated due to petitioner's kiting scheme. By transferring large deposits between accounts petitioner was able to earn interest in two different financial institutions during the period of "float." This activity, along with petitioner's real estate and accounting activities, are the source of potential income to which respondent determined that the unexplained deposits were attributable. At this point we are down to a relatively smaller number and amount of deposits which respondent continues to assert are unexplained and which petitioners have attempted to show were, for some reason, not taxable. We have set forth a schedule of the various disputed deposits and conclusions about each category of deposit based upon the evidence offered by petitioners. Most of petitioners' evidence on these remaining disputed deposits consists *322 of testimony and very little consists of documentation. Apparently, petitioners were able to convince respondent by means of documentation regarding the deposits which respondent has already eliminated. Regarding 20 of the deposits, petitioners either did not recall the source and/or no evidence was presented to explain the nature or source of all or part of the deposit. Concerning 16 of the disputed deposits, petitioners claimed that these amounts consisted of deposits of cash items resulting from cash withdrawals by means of checks, automated teller machine withdrawals, and other sources. Petitioner's testimony was general and either did not specifically tie any cash withdrawals that were relatively close from the time of cashing to the time of deposit or did not relate to any specific documentation or event. In this regard petitioner offered evidence of a few isolated instances of the receipt of cash at some time (on occasion a week or two prior to a disputed deposit) prior to a particular deposit. Petitioner did not show a consistent pattern or account for the time gaps where his avowed objective was to make interest on the float. We find petitioner's testimony on these *323 items to be unsupported by the record and incredible. Moreover, the amounts withheld from larger deposits, received through cashed checks or from automated teller machines, were relatively small and were more likely for ongoing everyday expenditures. Petitioner also claimed that some of these amounts were from rebates. Petitioner's testimony on this point was vague, and it was difficult to understand which companies paid the alleged rebates and the reason why the rebates were paid. We note that respondent in certain instances permitted reduction of certain deposits as being attributable to rebates, but petitioners' showing on this record is not sufficient to warrant further reduction of disputed deposits. With respect to certain transactions concerning petitioner's sister, Robin, there was sufficient evidence to corroborate testimony that some of the income and/or funds received and deposited belonged to Robin. One particular $ 6,603.80 amount was received by petitioner's sister, Robin, in the form of a $ 7,503.80 check from an insurance company. It was given to petitioner to invest (presumably in his kiting scheme), and he deposited the check and took a $ 900 cash withdrawal, *324 resulting in a $ 6,603.80 net deposit. Additionally, petitioners met their burden of showing that Robin owned Chrysler Corporation securities, some of which were reported on her 1983 Federal income tax return. Certain other items petitioner testified were "dividends" to his sister, Robin, but he did not explain the nature or source of the dividend. No documentation concerning the "dividends" was offered. There are also some items that petitioner claimed were given to him by his sister, but no corroboration was provided to show that those amounts were from his sister. Petitioner maintained and managed his sister Robin's funds. For reasons unexplained in the record, Robin's assets and funds were intermingled in petitioner's bank accounts. Additionally, during the years in question petitioners, on two or more occasions, purchased realty. On one occasion Robin's name was on the deed and on another it was not. Subsequent to the purchase, petitioner deeded his portion to Kathleen and Robin. Also, for reasons which were not adequately explained in the record, stock and other securities were held in Kathleen's and Robin's names, although petitioner was the person who was looking *325 after his sister's funds and assets. One particular $ 3,500 deposit concerned a check signed by both Kathleen and Robin Rohlig. The check was deposited in petitioners' bank account but represents funds of Robin Rohlig's which were managed and/or held by petitioner. We note that petitioner has a college degree in accounting and practiced as an accountant, but he kept no records of numerous receipts of funds, income, investments, etc., concerning his maintenance and management of her assets. Regarding certain of the deposits, petitioners claimed that they represented deposits from tenants who rented their realty. Petitioners did not show the return of the deposit or distinguish the "deposits" from rents. Although these claims are in connection with the rental of real property, no documentation was provided to substantiate or corroborate petitioner's testimony. Concerning the $ 1,883.65 and $ 112,012.50 checks issued through San Jacinto Title Company and from the bankruptcy of Murray Millican, petitioners claim that the $ 112,012.50 amount received in connection with the resale of the quadraplex represents the repayment of a loan made to Kathleen's parents. Petitioners provided *326 no admissible corroborating evidence that any amount of funds was advanced or loaned to Kathleen's parents or a clear source of same. Concerning the $ 1,883.65, petitioners claim that the amount constitutes a nontaxable source. No evidence was presented by petitioners to establish that such amount was not taxable. Several other disputed deposits are specifically addressed in our findings and need not be further detailed here. Suffice it to say that petitioners are entitled to a reduction in respondent's revised and reduced determination only to the extent so found in this opinion; otherwise the unexplained and unsubstantiated deposits are includable in income. Petitioners claimed to be entitled to certain depreciation and other deductions for the years in issue, but no evidence was offered or argument presented on brief concerning these items. Accordingly, we assume that petitioners have abandoned these claims, and if not, they have failed to carry their burden of showing that they are entitled to the claimed amounts. Finally, we consider whether petitioners are liable for an addition to tax for fraud under section 6653(b)(1) and (2). Respondent bears the burden of showing *327 by clear and convincing evidence that a part of either petitioner's underpayment was attributable to fraud. Sec. 6653(b); Rule 142(b). Under section 6653(b), the existence of fraud is a question of fact to be resolved upon consideration of the entire record. Estate of Pittard v. Commissioner, 69 T.C. 391 (1977); Gajewski v. Commissioner, 67 T.C. 181, 191 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Fraud is not to be presumed but, rather, must be established by some independent evidence of fraudulent intent. Beaver v. Commissioner, 55 T.C. 85, 92 (1970); Otsuki v. Commissioner, 53 T.C. 96 (1969). However, fraud may be proved by circumstantial evidence and reasonable inferences drawn from the facts because direct proof of intent is rarely available. Spies v. United States, 317 U.S. 492, 87 L. Ed. 418, 63 S. Ct. 364 (1943); Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983); Stephenson v. Commissioner, 79 T.C. 995 (1982), affd. 748 F.2d 331 (6th Cir. 1984). The entire course of conduct may establish the requisite *328 fraudulent intent. Stone v. Commissioner, 56 T.C. 213, 223-224 (1971); Otsuki v. Commissioner, supra at 105-106. The intent to conceal or mislead may be inferred from a pattern of conduct. See Spies v. United States, supra at 499. Respondent argues that fraud is evidenced in this case by facts showing that: (1) Petitioner was a college-educated accountant with exposure to tax accounting subjects in college. (2) Petitioner accumulated "substantial assets while reporting little or no income." (3) Petitioners were able to build a 2,960-square-foot home without obtaining construction loans. (4) The understatements of income could not have been due to inadvertence, carelessness, or ignorance. (5) Petitioners placed funds and assets in the name of the Life Science Church in order to hide assets and avoid paying tax. (6) Petitioners' child (Shawn) was claimed (by petitioner) on his sister's 1982 income tax return because the exemption would have the effect of reducing her tax, whereas it was not needed on petitioners' 1982 return. (7) Petitioners had been involved in "tax protest activities" for 1977 when they failed *329 to file a return and claimed 99 exemptions for withholding purposes. (8) Petitioners had a consistent pattern of understating income. (9) Petitioners failed to cooperate with respondent's agents in the conduct of their examination of petitioners' 1983 and 1984 returns. Here petitioners failed to report income during 1983 and 1984 and they were not cooperative with respondent's agents during the conduct of the examination. Further, one or both petitioners were involved in protest and/or mail-order church activities in years prior to 1983 and 1984 and have continually thwarted respondent's efforts to determine their correct tax liability. Additionally, the facts in this case reflect 2 years of understatement and a consistent pattern of understatement, even considering the substantial reductions in respondent's original determination caused both by respondent's concessions and our findings. We find that petitioners' pattern of conduct in connection with their 1983 and 1984 taxable years is sufficient to support the inference that they intended to conceal or mislead. See Spies v. United States, supra at 499. The lack of cooperation, petitioner's education, *330 and the fact that he was a practicing accountant and could be expected to keep adequate records support a finding of fraud. Petitioners are far from being forthright and responsible taxpaying citizens, and respondent has shown by clear and convincing evidence that their activity in connection with the 1983 and 1984 taxable years amounted to fraudulent activity with the intent to evade or avoid the payment of tax. Accordingly, we find that petitioners are liable for the additions to tax under section 6653(b)(1) and (2) for their 1983 and 1984 taxable years. To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. For convenience the findings of fact and opinion portions have been combined.↩
2. Unless otherwise indicated, all section references are to the Internal Revenue Code as amended and in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩